[Civ. No. 8415.   Third Dist.   Mar. 8, 1954.]

SAM WAHYOU et al., Respondents, v. DAVE OSTROVSKY, Appellant.

Leland S. Fisher for Appellant.

Forrest E. Macomber and Gordon J. Aulik for Respondents.

SCHOTTKY, J.—This is an appeal from a money judgment for the purchase price of certain meat and meat products which the trial court found were purchased by defendant from plaintiffs.

The complaint was filed in San Joaquin County and the action was transferred to Solano County.   The complaint contains three counts, i.e., a common count for goods sold and delivered, an open book account, and an account stated. Each count alleges that at all times mentioned therein appellant was doing business under the fictitious firm name and style of "Quality Meat Market."   Appellant did not deny this allegation.   Following a trial by the court, sitting without a jury, the court found in accordance with the allegations of

the complaint, and judgment for respondents was entered accordingly.

Appellant bases his argument for a reversal of the judgment upon three grounds: First, that there is nothing in the record to indicate that the account sued on was incurred by him, his employees or agents; second, that the record shows that prior to delivery of the merchandise in question respondents ''were in receipt of'' actual knowledge that it was not being purchased by appellant, his employees or agents; and third, that the trial court erred in holding that actual knowledge of a change of ownership of the meat market, imparted to respondents' agent prior to the time when the obligation sued upon was incurred, was not binding on respondents.

Before discussing these contentions we shall give a brief summary of the evidence as shown by the record.

Respondents are partners doing business as the Daylite Market. They are engaged in the wholesale distribution of meats and their main office is located in Stockton, California. Appellant operates a retail grocery business under the name of Quality Market, in Vallejo, California. A retail meat department or market, known as the Quality Meat Market, was operated in conjunction with appellant's business and one of the chief questions involved in this appeal is whether or not this retail meat operation was being conducted by or for appellant during the time when the purchases in question were made from respondents. The record shows that appellant was operating the meat market in June, 1949, when the first purchases were made from respondents. At that time James Sale was employed by appellant to manage the meat market. Thereafter, respondents continued to sell and deliver meat to the market until July, 1951, at which time a balance of $1,418.68 was owing and unpaid to respondents.

There is testimony showing that on October 31, 1949, appellant leased the meat market business to Sale and Vernon Bleamel who thereafter conducted it as a partnership venture until April 5, 1951, when Bleamel withdrew from the partnership, leaving Sale as the sole owner of the business. Sale continued on in the meat market until late in July, 1951, when he closed, apparently because of his inability to redeem certain checks which he had given to respondents over a 45-day period and which the drawee bank refused to honor for lack of funds. Appellant and Sale and Bleamel each testified to the lease

and the taking over of appellant's meat market business, although Sale was not certain whether this was done in 1949 or 1950. There was no written lease, but appellant and Bleamel testified that the rental was $100 per month, and the latter also testified that he and Sale took possession on October 31, 1949. Although Sale and Bleamel did not have a written agreement covering their partnership, their operation of the Quality Meat Market as a partnership venture is corroborated by the notice of dissolution of partnership which they had published in a Vallejo newspaper on April 6, 1951, and which was later filed in the office of the county clerk. Sale admitted that he owed the unpaid balance of $1,418.68, stating that it was incurred during his operation of the meat market after dissolution of the partnership.

There is no direct testimony refuting the claimed change in ownership and operation of the meat market business, but there is evidence which will support inferences to the contrary. The record shows, in this regard, that the business was continued under the same name as before; that the business license, apparently issued by the city of Vallejo, was retained and renewed in appellant's name; none of the signs in the market was changed; no notice of intended transfer was published or recorded; and Sale, who had managed the operation for appellant, continued on in the meat market. No written notice of the change in ownership was sent to respondents, although the testimony of appellant and Sale and Bleamel is to the effect that respondents' salesman, Jack Peters, was told of the change in ownership and operation when he was at the market on October 31, 1949 (the day when the change allegedly took place), and Sale then placed an order with him. It appears that Sale had not done the ordering prior to this time, but he placed all of the orders thereafter. The orders were given to respondents' salesman, and the checks in payment were given either to the salesman or to respondents' driver. In evidence are the customer's copy of the invoice for Sale's first order, and the cancelled check given in payment. The invoice shows that the order was billed to "Quality Market," and the check was signed "Quality Meat Market, Vernon Bleamel." There is no showing that Peters, the salesman, ever told his principals of the change in ownership. The account was carried under the name of Quality Meat Market, on respondents' books. No change in ownership is indicated on the ledger sheets, although respondents' credit manager testified that a new ledger sheet

would have been set up for the account if notice of the change had been received at the home office. Apparently Peters left respondents' employ during the early part of 1950; he did not appear at the trial.

Leon Rahe was the salesman to whom Sale gave the worthless checks. He admitted that he did not take the matter of payment up with appellant personally, but explained that appellant was in the hospital at the time. Rahe apparently took over the Vallejo territory, as salesman for respondents, on May 15, 1951. There is a conflict in the evidence as to what was said regarding ownership of the meat market when Rahe and Sale first met. Sale testified that Peters brought Rahe to the meat market and introduced Sale as the owner. Rahe testified that he went alone, introduced himself, and nothing was said regarding the ownership. This was more than a year after Peters left respondents' employ.

As to appellant's contention that there is no evidence in the record to support a finding that the account sued on was incurred by appellant or his employees or agents, it is to be noted that the complaint alleges that at all times mentioned therein appellant was doing business under the fictitious firm name of "Quality Meat Market." Appellant did not deny this in his answer, so the allegation must be taken as true. (Code Civ. Proc., § 462.) ■ No evidence was required to prove this fact, and no finding thereon was necessary (*City of Los Angeles* v. *City of Huntington Park*, 32 Cal.App.2d 253, 265 [89 P.2d 702]; *Welch* v. *Alcott*, 185 Cal. 731, 754 [198 P. 626]), but the trial court did make a finding consistent with this admission, and it made a further finding that within two years last past appellant, doing business under that name, became indebted to respondents in the sum of $1,418.68 for meat and meat products sold and delivered by the latter to the former, and that the whole of said sum was due, owing and unpaid. It is a fair inference that if appellant was doing business under the name of Quality Meat Market at the time the purchases in question were made, Sale and Bleamel were not doing business under the same name at the same time and place. Too, the evidence shows that the account was carried under the name of Quality Meat Market on respondents' books. The only check in evidence shows that payment, at least in that instance, was made by check signed "Quality Meat Market, Vernon Bleamel." It does not appear how the worthless checks, given

by Sale, were signed, the testimony merely showing that they "were drawn upon James Sale," they "were made out by James Sale," and they "were James Sale's checks." The fact that Bleamel signed his name to the check in evidence does not necessarily show a change in ownership of the business; he may have been authorized by appellant to write checks for meat purchases. ■ There is other evidence from which the continued ownership and operation of the business by appellant may be inferred, e.g., the failure to change the owner's name in the business licenses, the use of the same business name and signs, and the continued presence of Sale who had managed the department of appellant.

We do not believe that the testimony of appellant and of Sale and Bleamel regarding the change in ownership and operation compelled the trial court to find that the purchases in controversy were not made by or for appellant. For as stated by this court in *Norgard* v. *Estate of Norgard*, 54 Cal.App.2d 82 [128 P.2d 566], at page 89:

". . . The trial court is the sole judge of the weight and effect of testimony and of the credibility of witnesses, and is free to disbelieve them, even though they are uncontradicted, if there is any rational ground for doing so. (*Davis* v. *Judson*, 159 Cal. 121 [113 P. 147].) As was said by our Supreme Court in the very recent case of *Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868]:

" 'There are many reasons why a jury may refuse to believe a witness. Section 1847 of the Code of Civil Procedure provides: "A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies, by the character of his testimony, or by evidence affecting his character for truth, honesty, or integrity, or his motives, or by contradictory evidence; and the jury are the exclusive judges of his credibility." Section 2061(3) of the Code of Civil Procedure provides: "That a witness false in one part of his testimony is to be distrusted in others." In passing upon the credibility of a witness, the jury is entitled to consider his interest in the result of the case. (See cases collected in 27 Cal.Jur. 180, § 154.)' "

And as was said in *Davis* v. *Judson*, 159 Cal. 121 [113 P. 147], at pages 128, 130:

"It is insisted by appellants that this testimony of Wilson stood uncontradicted and that the court had no right arbitrarily to reject it and find to the contrary.

"While it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted by the court as proof of the fact, this rule has its exceptions. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statement of the transaction; or there may be circumstances in evidence in connection with the matter, which satisfy the court of its falsity; the manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard his positive testimony as to a particular fact; and as it is within the province of the trial court to determine what credit and weight shall be given to the testimony of any witness, this court cannot control its finding or conclusion denying the testimony credence, unless it appears that there are no matters or circumstances which at all impair its accuracy. . . .

"So that, within the rule as we have stated, while the trial court had the statement of Wilson that he was sure that he had obtained a deed from the trustees, and although there was no direct testimony impeaching him or contradicting his statement, still the conduct of Wilson, as disclosed by his other testimony and the other circumstances in evidence, were such that the court had a right to conclude that they were inconsistent with the execution of any conveyance to Wilson, and warranted the rejecting as improbable his statement that such a conveyance had been made."

Applying the test of these authorities to the evidence in the instant case, and to the inference which may reasonably be drawn from such evidence, we are satisfied that there is ample support in the record for the finding that the appellant was indebted to respondents for meat and meat products sold and delivered by respondents to appellant at appellant's special instance and request. Our conclusion upon this point makes it unnecessary to discuss the remaining contentions of appellant.

The judgment is affirmed.

Peek, J., and Paulsen, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.